The PEOPLE of the State of
Colorado, Petitioner,

v.

DISTRICT COURT In and For the FIRST
JUDICIAL DISTRICT, JEFFERSON
COUNTY, Colorado, and the Honorable
Winston W. Wolvington, One of the
Judges Thereof, Respondents,

and

Milton L. Born–With–A–Tooth,
Defendant–Intervenor.

No. 88SA287.

Supreme Court of Colorado,
En Banc.

Jan. 17, 1989.

Donald E. Mielke, Dist. Atty., Donna Skinner Reed, Sr. Deputy Dist. Atty., Golden, for petitioner.

No appearance for respondents.

David F. Vela, Colorado State Public Defender, Victoria J. Koury, Deputy State Public Defender, Golden, for defendant-intervenor.

VOLLACK, Justice.

The People filed this petition pursuant to C.A.R. 21, seeking relief in the nature of mandamus and a writ of prohibition against the respondent, Jefferson County District Court. The judge ordered the prosecution to reveal the identity of the confidential informant and ruled that if the prosecution failed to do so, the criminal charges against the defendant would be dismissed. The charges of second degree murder and felony child abuse resulting in death filed against the defendant, Milton Born–With–a–Tooth, arise from the alleged suffocation murder of his three and one-half year old son in a motel room in Lakewood, Colorado. When the prosecution failed to obtain the identity of the confiden-

tial informant from Canadian law enforcement authorities and disclose the informant's identity to the defendant, the court ruled that it was going to dismiss the criminal charges if the prosecution did not discover and reveal the identity and whereabouts of the confidential informant within seven days. The People filed this petition the next day. We issued a rule to show cause why the court should not be prohibited from dismissing the criminal charges and why the order compelling disclosure of the informant should not be vacated. We now make the rule absolute.

## I.

On October 14, 1984, Lakewood Police Detective Steve Evans received a call for assistance concerning the death of a three and one-half year old child. Detective Evans responded to the King's Rest Motel on West Colfax Avenue where he found a child named Shining Eagle Yellowhorn. Shining Eagle was transported to Saint Anthony's Hospital where he was pronounced dead. Detective Evans interviewed the child's mother, Leslie Yellowhorn (the mother) and the child's father, Milton Born–With–a–Tooth (Born or the father).[1] The mother, father and child had traveled to the United States from Canada and were living in a motel room. The mother told the detective that she and the father were sleeping in the motel room when their son accidentally suffocated after pulling a plastic bag over his head. She told Detective Evans that she awoke to hear the father attempting to resuscitate the child and saying "something was wrong." The mother also told the detective that she was not aware of any abuse of the child by his father. The father gave the same version of the child's death when questioned by Detective Evans.

Detective Evans attended the autopsy performed on the child's body. The autopsy report concluded that the child died as a result of suffocation. The report also stated that the doctor believed that the child's "bruises on the lower extremities [were] compatible with the child's age," rather than the result of abuse. After receipt of the autopsy report, investigation of the case was concluded.

Almost two years later, in September 1986, Detective Evans was contacted by Sergeant Welke of the Royal Canadian Mounted Police (RCMP).[2] Welke worked in the area of Alberta, Canada, where the Blackfoot Indian Reservation is located. Based on his interviews with Born and Leslie Yellowhorn in 1984, Detective Evans knew that Born and Yellowhorn belonged to the Blackfoot tribe and that they considered the Blackfoot Reservation to be their home. Sergeant Welke was contacting Evans because Welke had recently received information from a confidential informant that Shining Eagle's death was the result of foul play. Welke called Evans on two separate occasions and said he would mail a report to Evans when he obtained more information.

After these telephone conversations, Evans traveled to Canada in March 1987 and met with Leslie Yellowhorn. After returning to Colorado, Evans received the RCMP's written reports. The reports stated that the RCMP had a confidential informant in the case, and included a copy of the informant's statement. The report indicated that Leslie Yellowhorn had spoken with the confidential informant and told the informant that Born had killed Shining Eagle. The confidential informant then contacted Constable Potts, a constable on the Blackfoot Reservation. The statement

1. The record is not clear but it appears that the mother and father considered themselves to have entered into a common-law marriage. Whether they were married and whether Born could prohibit Leslie Yellowhorn from testifying based on the marital privilege was to be determined at a motions hearing scheduled for July 15, 1988. The transcript of the hearing

held on that day does not reveal whether the court ruled on this question.

2. The Royal Canadian Mounted Police is the national police agency of Canada. The RCMP polices the Blackfoot Reservation, which spans the Canadian–U.S. border and extends into the state of Montana.

from the confidential informant was the first information provided to official sources indicating that Shining Eagle's death was the result of foul play.

After the confidential informant spoke to the Canadian authorities, Leslie Yellowhorn came forward; from the time of her conversation with the informant, she has given four versions of the events of October 14.[3] All four versions differ somewhat in the details. The first version of Shining Eagle's death, given to authorities by the confidential informant, was that Yellowhorn told the confidential informant that as part of an ongoing and escalating pattern of abuse, Born "took a plastic bag and put it over the boy's head til[l] the boy suffocated." [4]

In her signed statement for the RCMP, Yellowhorn gave the second version, which stated: Milton Born "wrapped Shining Eagle in a sheet binding his arms and legs from the neck down. Shining Eagle was crying. Milton was watching football. He put Shining Eagle on the floor by the bed face down and put a pack sack by his legs and arms so he couldn't move. Shining Eagle kept crying. Milton took a piece of rag and gagged Shining Eagle." [5]

As a result of this information, Born was arrested in Canada and extradition proceedings followed. At the extradition hearing in Lethbridge, Alberta, Canada, Leslie Yel-

lowhorn testified to a third version of Shining Eagle's death, stating that Born became angry because Shining Eagle was crying and placed the boy "on the floor with the pack sacks on him and he was under, halfway under the bed with them resting on him." She testified: "Milton couldn't hear the football [game on the television] because my little boy was crying more and he got mad and he bent over and he got a rag and he took it, he took the pack sacks off, he tied it around my son and covered his mouth so he wouldn't cry so loud and then he put the pack sacks back." She testified that the rag was a piece of shirt material tied around Shining Eagle's mouth, but not inside his mouth and possibly not covering the child's nose. Leslie Yellowhorn testified that after she fell asleep, the child fell asleep crying and died.

It took over one year for Born to be extradited to Colorado. Charges of second degree murder and felony child abuse resulting in death were filed against him in Jefferson County District Court. Born's counsel filed a Motion for Disclosure of Confidential Informant and the district court conducted a hearing. At the hearing on the motion to disclose in Jefferson County District Court in July 1988 Leslie Yellowhorn gave this testimony, the fourth version of Shining Eagle's death. On October 14 Born became angry because Shining

---

**3.** At the hearing on the motion to disclose the informant's identity, Born's attorney listed these as the four versions of Shining Eagle's death: Leslie Yellowhorn's statement to Detective Evans in October 1984, the confidential informant's version, Leslie's written statement to RCMP, and the testimony at the extradition hearing. The testimony at the hearing on the motion to disclose now represents a fifth version. For purposes of discussion, we address the most recent four statements.

**4.** The portion of the confidential informant's statement pertaining to Shining Eagle's death is quite brief and states:

While they were in the States Milton [Born–With–a–Tooth] started to abuse the boy. He used to beat him and had him tied under the bed. He would feed the child by pushing a plate of food under the bed for the child.

One day the child tried to run away. Milton got real made [sic] at him. He started to beat him and throw him around the room. Finally Milton took a plastic bag and put it over the boy's head til the boy suffocated.

Leslie claimed she could not do anything she just watched Milton kill the child. Milton told the police that the boy died at a playground. While playing the boy put a plastic bag over his head and suffocated.

The remainder of the confidential informant's written statement involves Born's continuing physical and emotional abuse of Leslie Yellowhorn after Shining Eagle's death.

**5.** The "pack sacks" repeatedly referred to by Leslie Yellowhorn were evidently back packs in which the family carried their belongings, and other items such as soiled laundry.

Eagle was drinking water,[6] struck him, and caused his nose to bleed. Next, Born wrapped the child in a sheet, placed him face down on the bed, and ordered him to stay in that position without moving. When Shining Eagle loosened himself from the sheet, Born "wrapped him up again and put him on the floor beside the bed and put two pack sacks beside him to hold him down with his face down...." After rewrapping the child in the sheet, Born "tied a rag around his mouth," securing it with a knot. The mother testified that she was unable to intervene and fell asleep crying, and that the next thing she remembered was Born awakening her. Born untied and unwrapped the child; his attempts to revive Shining Eagle were unsuccessful. Born called the police.

During cross-examination at the motions hearing, a transcript of Yellowhorn's testimony from the extradition proceeding was introduced into evidence and used by defense counsel to impeach portions of her testimony.

During the hearing on the motion to disclose, the prosecutor introduced into the record the portion of Sergeant Welke's report in which Constable Potts explained that the confidential source felt unable or unwilling to come forward due to "the lingering fear by the confidential source of the reprisal or retaliation." The confidential informant was thought to be an "individual who lived on the Reserve." Prior to this hearing the prosecution contacted the RCMP and the constable there refused to reveal the identity or whereabouts of the informant.

On the motion to disclose the confidential informant, the district court entered this written order:

CONCLUSIONS OF LAW: The cases indicate that in determining whether or not to Order disclosure of the name of the confidential informant the Court must consider the following:

1. Was the informant an eye or ear witness to the crime?

2. Is the informant available?

3. Are there any other witnesses to the transaction?

4. Is there a likelihood that the testimony will vary from that of other witnesses?

5. Does the Defendant know the identity of the confidential informant?

6. The Court must balance the needs of law enforcement against the rights of the Defendant[.]

In this case unless Leslie Yellowhorn is herself the informant, the informant was not an eye or ear witness to the crime. There is a question as to whether the informant is available because the identity of the informant has not been revealed. There were no witnesses to the alleged crime other than Leslie Yellowhorn and the Defendant. There is a strong likelihood that the testimony of the confidential informant will vary from the testimony of Leslie Yellowhorn. The Defendant does not know the identity of the confidential informant.

This is not a case in which revelation of the identity of the confidential informant is going to interfere with the police operation. In many cases the police are using a confidential informant and intend to use that informant on other cases, and therefore want to maintain the confidentiality. In this case the confidential informant is simply a reporting party and the Court concludes that the balance between the needs of law enforcement and the Defendant's rights favor enforcement of the Defendant's rights over maintaining confidentiality.

ORDER: It is Ordered that the Prosecution reveal to counsel for the Defendant the identity of the confidential informant and furnish all information as is available concerning the whereabouts of

---

6. The ongoing and escalating pattern of abuse by Born included Born alternately refusing to let the child drink water for long periods of time and forcing him to drink large quantities of water, refusing to let the child look out the window or leave the motel room, and punishing infractions of these rules with daily beatings and forced cold showers.

that person so that contact can be made by defense counsel.

When the prosecution contacted the Canadian authorities who knew the informant's identity, the Canadians refused to identify the informant. The prosecution did not comply with the court's order to reveal the identity of the confidential informant. Defense counsel filed a motion to dismiss, and on August 17, 1988, a hearing was held on the motion. The prosecutor stated at this hearing that he had contacted Constable Potts a second time and Potts had again refused to reveal the name, identity and location of the confidential source "because there was indeed real, in [Potts'] opinion, there was a real [and continuing] threat to the confidential source's life." In response to the prosecution's refusal or inability to reveal the confidential informant's identity, the district court entered this ruling at the August 18 hearing:

> The Court is of the opinion that *if the Prosecution does not comply, there is no alternative but dismissal in the case.* It's the only fair way that this case can be handled is for the Prosecution to reveal the identity of this confidential informant.
>
> If the Prosecution can't or won't do that, the only alternative is dismissal of the case.
>
> . . . .
>
> All right, the Court is going to order that the confidential informant be revealed by Monday, August 22, 1988, or the alternative will be dismissal of the case.

(Emphasis added).

The next day the prosecution filed a petition for relief asking this court to issue a rule to the respondent district court directing it to show cause why it should not be prohibited from dismissing the criminal charges and why the order compelling disclosure of the informant's identity should not be vacated. We issued a rule to show cause and now make the rule absolute.

## II.

■■■ The government has a qualified privilege to choose not to disclose the iden-

tity of a confidential informant. *People v. Vigil*, 729 P.2d 360, 364 (Colo.1986). While a defendant generally does not have a constitutional right to learn the identity of a confidential informant, "considerations of fundamental fairness sometimes require that the identity of such an informant be revealed." *Id.* (citing *Roviaro v. United States*, 353 U.S. 53, 60–61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1983)). The standard described by the United States Supreme Court is this: "Where the disclosure of an informer's identity, or the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60–61, 77 S.Ct. at 628. Therefore, if a defendant has established that learning the informant's identity, or the contents of the informant's communication, is either relevant and helpful to his defense or "essential to a fair determination of a cause," then a trial court can order disclosure. *Id.* at 61, 77 S.Ct. at 628. "[T]he mere involvement of an informant certainly does not justify the compelled disclosure of his identity." *People v. Peterson*, 40 Colo.App. 102, 106, 576 P.2d 175, 178 (1977), *cert. denied*, (Colo. March 20, 1978). Rather, disclosure is required if the facts establish that the informant "was 'so closely related' to the defendant" as to make the informant's testimony highly material. *Id.* (quoting *Roviaro*, 353 U.S. 53, 77 S.Ct. 623).

■■■ "Once a defendant has made a minimal showing of need for the information," the propriety of disclosing the identity of a confidential informant should be decided by applying a balancing test. *People v. Cook*, 722 P.2d 432, 435 (Colo. App.1986) (emphasis added). In deciding whether to order disclosure, a trial court must weigh the public interest in protecting the purpose served by the use of confidential informants against the defendant's need to obtain evidence in order to prepare his defense. *Vigil*, 729 P.2d at 364. This balancing test depends on the circumstanc-

es of each case; the ultimate decision whether to require disclosure is within the trial court's discretion. *Id.* at 364–65; *People v. Roy,* 723 P.2d 1345, 1347 (Colo.1986).

■ The limit on this broad discretion is that "disclosure of a confidential informant may be ordered only where the defendant has established a 'reasonable basis in fact to believe the informant is a likely source of relevant and helpful evidence to the accused.'" *Vigil,* 729 P.2d at 365 (quoting *People v. Bueno,* 646 P.2d 931, 936 (Colo.1982)).[7] "Conjecture and speculation will not suffice." *People v. McLean,* 661 P.2d 1157, 1159 (Colo.1983). Some factors relevant to this balancing test are the following:

> [W]hether the informant was an eyewitness and earwitness to the criminal transaction and whether the informer himself is available or could, in the exercise of reasonable diligence, be made available; whether other witnesses to the transaction are in a position to testify; the likelihood that the testimony of the informer will vary significantly from that of other available or potentially available witnesses; whether the defendant himself knows the identity of the informant or could without undue effort discover his identity; whether the informant was deeply or only peripherally involved in the criminal transaction.

*People v. Marquez,* 190 Colo. 255, 259, 546 P.2d 482, 485 (1976). No single factor should be "considered a threshold requirement or determinative of disclosure or nondisclosure." *People v. Gable,* 647 P.2d 246, 254 (Colo.App.1982), *cert. denied,* (Colo. May 24, 1982); *see People v. Del Alamo,* 624 P.2d 1304, 1307 (Colo.1981).

■ On review, we must determine if there is evidence in the record to support the trial court's ruling. *People v. Korte,* 198 Colo. 474, 602 P.2d 2, 3 (1979). If there is not evidence to support the trial court's ruling, then a reviewing court may reverse the ruling. The record in this case establishes that the trial court abused its discretion when it ruled that the charges against Born would be dismissed if the prosecution did not reveal the identity of the Canadian confidential informant.

First, we note that this confidential informant was not and could not have been an earwitness or eyewitness to Shining Eagle's death.[8] We have held that if an informant was not an eyewitness or earwitness to the crime, "the defendant necessarily has more difficulty showing that disclosure of the informant would be relevant or helpful to the defense" because "[t]he possibility that disclosure of the informant will result in evidence relevant or helpful to the accused is simply more remote under such circumstances." *Vigil,* 729 P.2d at 365. *Compare Roviaro,* 353 U.S. at 64, 77 S.Ct. at 630 ("This is a case where the Government's informer was the sole participant, other than the accused, in the transaction charged.") *with Marquez,* 190 Colo. at 258, 546 P.2d at 484 (Even though the informant was an eyewitness and an earwitness, it was "not at all clear" that disclosure of the informant's identity would have assisted the defense.).

The second factor is whether the informant is or could be made available by the exercise of reasonable diligence. Here, the record shows that the prosecution attempted on at least two occasions to obtain information about the confidential informant from the Canadian authorities. Colorado

---

7. This is the standard that applies when the identity of a confidential informant is sought for establishing the issue of innocence or guilt, and must be distinguished from the standard which applies when an informant's identity is sought for the purpose of challenging the existence of probable cause to support a search warrant. *See People v. Dailey,* 639 P.2d 1068 (Colo. 1982).

8. The trial court's order said that "unless Leslie Yellowhorn is herself the informant, the informant was not an eye or ear witness to the crime." In the absence of any further discussion, findings or evidence regarding the possibility that Leslie Yellowhorn is the informant, we have assumed that she is not. She did testify that she thought one of her uncles was the informant.

law enforcement authorities do not know and have never been given the identity of the informant; this information was only available from the Canadian authorities. The trial court's order says that there "is a question as to whether the informant is available."

The third factor is whether there are other witnesses in a position to testify. Here, of course, the mother—the only witness—has been and continues to be available to testify.

The fourth factor is the likelihood that the informant's testimony will vary significantly from that of other witnesses. The court noted that there were no witnesses to the alleged crime other than the mother and father, but found "a strong likelihood that the testimony of the confidential informant will vary from the testimony of Leslie Yellowhorn."

The fifth factor is whether the defendant knows, or could without undue effort, discover the identity of the informant. Leslie Yellowhorn testified at the motions hearing that she had spoken with members of her family and that she knew the confidential informant was one of her uncles, but she did not know which one. No finding was entered on this factual issue.

Finally, a trial judge must consider whether the informant was "deeply or only peripherally involved" in the crime. Here, there was no involvement whatsoever of the informant in the criminal transaction, because only the mother, the father and Shining Eagle were in the motel room when Shining Eagle died. This factual setting differs significantly from a case like *Roviaro*, where the government sought to "withhold the identity of an informer who helped to set up the commission of the crime and who was present at its occurrence." 353 U.S. at 61, 77 S.Ct. at 628; *see State v. Blyther*, 287 S.C. 31, 336 S.E. 2d 151 (1985) ("An informant's identity need not be disclosed where either the *informant possesses only a peripheral knowledge of the crime or is a mere tipster who supplies a lead to law enforce-*

*ment authorities.* Where, however, the informant either is a material witness to the crime or directly participates in it, disclosure may be required...." *Id.* at 33, 336 S.E.2d at 152–53 (citations omitted) (emphasis added)); *State v. Walls*, 294 S.E. 2d 272 (W.Va.1982) (*"The general rule is that where the informant has only peripheral knowledge of the crime, his identity need not be disclosed.* Where the informant directly participates in the crime, or is a material witness to it, disclosure may be required, particularly where, in a drug related crime, he is the only witness to the transaction other than the defendant and the buyer." *Id.* at 278 (citations omitted) (emphasis added)).

This is not a case in which the confidential informant's identity is necessary to determine whether there was probable cause to support a search or arrest warrant. Neither is this a case where the informant's information is determinative of "the critical [issue] of guilt or innocence." *People v. Langford*, 191 Colo. 87, 89, 550 P.2d 329, 331 (1976). At the hearing on the motion to dismiss, defense counsel expressly stated that they sought the confidential informant *in order to "impeach the star witness* of the Prosecution, Leslie Yellowhorn." (Emphasis added). Given the facts and record in this case, this argument does not convincingly establish the defendant's need for the informant's identity in order to fairly prepare a defense.

We addressed the merits of a similar purpose in *People v. Mulligan*, 193 Colo. 509, 568 P.2d 449 (1977). There, we held:

[A]ppellant's interest in learning the informer's identity appears slight. The informer was not a witness to nor was he involved in any criminal activity of appellant. *His testimony was desired solely to impeach* one of the People's witnesses.... In view of this fact [that the impeaching testimony was more inculpatory to the appellant] *and the fact that* [the witness'] credibility was attacked by other evidence, we cannot say that the trial judge erred in concluding that the

public's and informer's interest in preserving his anonymity outweighed appellant's interest in disclosure. 193 Colo. at 515, 568 P.2d at 454–55 (emphasis added). The confidential informant's version of Yellowhorn's explanation of Shining Eagle's death, was one of four or five [9] varying versions, three of which are available to and have already been used by the defendant. These other statements are available for purposes of impeachment and are sufficient for that purpose, especially when balanced with the fact that the informant was not an earwitness or eyewitness to the criminal transaction and was not even peripherally involved in the crime itself. As we noted in *People v. Marquez*, the "defendant had available to him a witness to the transaction, ... who could have testified concerning the details of the transaction." 190 Colo. at 259, 546 P.2d at 485. Here, Leslie Yellowhorn is available as a witness and defense counsel has a wealth of evidence and inconsistent testimony with which to impeach her.

In other cases, we have noted even more specific considerations such as whether "nondisclosure of the information was necessary to protect the safety, welfare and possibly the life of the confidential informant." *Roy*, 723 P.2d at 1348. In *Roy*, the trial court had concluded that disclosure would endanger the informant's life. 723 P.2d at 1347. We have also considered an informant's fear for his safety and the safety of his family. *People v. Mulligan*, 193 Colo. at 515, 568 P.2d at 454. Here, the Canadian authorities refused to reveal their informant's identity for that express reason.

**9.** *See supra* note 3.

**10.** We note that in further proceedings, the trial court may decide that some remedy is appropriate in order to ensure the defendant's right to a fair trial. If Yellowhorn at trial admits to the version of events recounted to the informant or, alternatively, admits to the complete contents of her statement to the informant, then the defendant will have no need to introduce extrinsic evidence in order to prove the prior statement. CRE 613 provides in this respect that if a witness admits making a prior inconsistent state-

[11] "A defendant is not entitled to the disclosure of an informant based on the bare assertion that his defense requires it." *People v. Vigil*, 729 P.2d at 364; *People v. Marquez*, 190 Colo. at 259, 546 P.2d at 485. An order to disclose " 'must be supported by the record' " and cannot depend on mere speculation or conjecture. *Id.* at 364–65 (quoting *People v. Bueno*, 646 P.2d 931, 936 (Colo.1982)).

■ The evidence shows beyond dispute "that the informant had *merely relayed information* to officials, which proved accurate and resulted in defendant's arrest. When all the evidence discloses that *the informant was an informant and nothing more*, the prosecution should not, as a general rule, be required to reveal his identity." *Langford*, 191 Colo. at 90, 550 P.2d at 331 (emphasis added). A record which shows that the informant "was an informant and nothing more" and that the informant "merely relayed information to officials" does not support the trial court's conclusion that disclosure is required.[10] The trial court stated in its own order that "[i]n this case the confidential informant is simply a reporting party."

The court's ruling is not supported by the evidence in the record. We conclude that the importance of revealing the informant's identity in this case is not outweighed by the considerations supporting protection of the informant, especially in light of the severity of the sanction imposed by the trial court. We therefore conclude that the trial court abused its discretion in ruling as it did in this case, and make the rule absolute.

QUINN, C.J., dissents in part.

ment, "additional extrinsic evidence that the prior statement was made is inadmissible."

In the event that Yellowhorn denies the version of the events made to the informant, the defendant may desire Yellowhorn's statement to the informant for substantive purposes pursuant to section 16–10–201, 8A C.R.S. (1986). If the defendant makes such an offer under the statute, the trial court can ensure the defendant's right to a fair trial by making the statement available without disclosing the identity of the informant.

QUINN, Chief Justice, dissenting in part:

I dissent in part because, in my view, the majority erroneously discounts the importance of the informer's identity to the defendant's right to present relevant evidence in his defense. I believe the trial court properly weighed the qualified privilege applicable to an informer against the defendant's right to prepare a defense and, in the exercise of sound discretion, ordered the disclosure of the informer. I would therefore discharge the rule as to the order of disclosure. Since, however, the trial court had available to it other sanctions less drastic than dismissal to redress the prosecution's refusal to disclose the identity of the informer, I would make the rule absolute as to the order of dismissal.

### I.

In determining whether to order the disclosure of the identity of an informer, a trial court must balance an accused's right to prepare a defense against the public interest in protecting the flow of information to law enforcement agencies. *E.g., Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). In striking a balance between these sometimes divergent interests, a court should consider the total circumstances of the case including, where applicable, the following factors: whether the informer was an eyewitness or earwitness to the transaction; whether the informer is or can be made available with reasonable diligence; whether other witnesses to the transaction can testify to the facts known by the informer; whether the informer's testimony varies significantly from other available witnesses; whether the defendant knows the identity of the informer or can discover that identity without undue effort; and whether the informer was only peripherally or centrally involved in the criminal transaction. *People v. Marquez,* 190 Colo. 255, 258–59, 546 P.2d 482, 485 (1976). Because a trial court is much better equipped than an appellate court to resolve the issue of disclosure, the

trial court's decision should be given substantial deference. *People v. Vigil,* 729 P.2d 360, 365 (Colo.1986); *People v. Dailey,* 639 P.2d 1068, 1077 (Colo.1982). If there is evidence in the record to support the order of disclosure, the order should stand. *Vigil,* 729 P.2d at 365; *People v. Korte,* 198 Colo. 474, 476, 602 P.2d 2, 3 (1979).

In my view, the record adequately supports the trial court's order of disclosure in this case. Although not an eyewitness to the offense, the informer nevertheless was a witness to a highly significant statement made by Leslie Yellowhorn concerning the manner in which the alleged crime occurred. In her statement to the informer, Yellowhorn stated that the child attempted to run away and the defendant, in anger, then beat and killed the child by placing a plastic bag over the child's head. However, in Yellowhorn's other statements— her statement to the Royal Canadian Mounted Police, her testimony at the extradition hearing, and her testimony at the hearing on the motion to disclose—she offered a different version of the events. In two of these three statements, Yellowhorn indicated that the defendant had been watching a football game on television, became upset with the child because he was crying, and then proceeded to kill the child. In all three statements, Yellowhorn stated that the defendant used pack sacks to immobilize the child and killed the child by placing a rag over the child's mouth. There are thus two distinct versions given by Yellowhorn concerning the circumstances surrounding the child's death. Although both versions are highly incriminating as to the defendant, the difference in the two versions points up the important impeachment value of Yellowhorn's statement to the informer and the significance of that statement to Yellowhorn's credibility as a witness.

The trial court's order of disclosure was calculated to provide the defendant with access to this impeachment evidence in the event Yellowhorn testified at trial to a version of events different from her statement

to the informer. If at trial, for example, Yellowhorn were to testify to a version of the events different from her statement to the informer, then evidence regarding Yellowhorn's prior statement to the informer would be of great use to the defendant for its impeachment value. There is no claim here that the defendant knows the identity of the informer or could reasonably discover that identity without the order of disclosure. Nor are we dealing here with a situation of a paid or long-standing informer whom law enforcement authorities intend to use in the future. Under these circumstances, the state's interest in preserving the anonymity of the informer in order to protect the flow of information to law enforcement authorities is of much less significance than is the defendant's opportunity to effectively cross-examine and possibly impeach a crucial prosecution witness in a case involving serious felony charges. Finally, although there was some indication that the informer harbored some fear of reprisal if his identity were to be disclosed, the evidence on this point was far from compelling and certainly not such as to require the district court to give it conclusive weight. The trial court, in my view, made adequate findings to support its conclusion that the balance should be struck in this case in favor of disclosure. I therefore would discharge the rule as to the order of disclosure.

## II.

While I would discharge the rule on the issue of disclosure, I would make the rule absolute as to the sanction of dismissal. Dismissal "is a drastic remedy to be reserved for situations where no other sanction would attain the proper result." *People v. Sams*, 685 P.2d 157, 163 (Colo.1984) (quoting *People v. Holloway*, 649 P.2d 318, 320 (Colo.1982)). In this case, a remedy far short of dismissal can adequately protect the defendant's right to a fair trial.

If at trial Yellowhorn testifies on direct examination to the version of events told to the informer, the defendant will have no need to impeach Yellowhorn on the basis of her statement to the informer. Yellowhorn, of course, would be subject to cross-examination regarding her other prior statements about the circumstances surrounding the child's death, but no issue is raised here with respect to the defendant's ability to prove those prior statements in the event Yellowhorn were to deny them. Similarly, if Yellowhorn at trial testifies on direct examination to a version of events different from that told to the informer, but either on direct or cross-examination admits to the complete contents of her statement to the informer, the defendant will have no legal basis to further impeach Yellowhorn by introducing extrinsic evidence in order to prove the prior statement to the informer. CRE 613 states in this respect that "if a witness admits making the prior statement, additional extrinsic evidence that the prior statement was made is inadmissible."

If, however, Yellowhorn testifies at trial to a version of events different from that told to the informer and further denies her statement to the informer, the defendant will have a genuine need to offer into evidence Yellowhorn's prior statement to the informer as the basis for impeaching her testimony. In the event Yellowhorn so testifies, the trial court can readily accommodate the defendant's interest in making use of Yellowhorn's prior statement by adopting the following procedure: first, by requiring the prosecution, in lieu of a more drastic sanction, to concede the authenticity of the informer's statement; next, by admitting into evidence the typewritten summary of the informer's statement prepared by the Canadian police officer to whom the informer spoke; and last, by instructing the jury that the typewritten summary accurately reflects what in fact the informer did tell the officer and may be considered by the jury for impeachment purposes. This procedure, in my view, would place the defendant in virtually the same position he would have been in had the prosecution disclosed the identity of the informer.

It might well be that at trial the defendant may desire to offer Yellowhorn's statement to the informer as substantive evidence of the facts to which Yellowhorn's testimony and statement relate. Section 16–10–201, 8A C.R.S. (1986) authorizes the admission of a prior inconsistent statement as substantive evidence under the following circumstances:

(1) Where a witness in a criminal trial has made a previous statement inconsistent with [her] testimony at the trial, the previous inconsistent statement may be shown by any otherwise competent evidence and is admissible not only for the purpose of impeaching the testimony of the witness, but also for the purpose of establishing a fact to which [her] testimony and the inconsistent statement relate, if:

(a) The witness, while testifying, was given an opportunity to explain or deny the statement or the witness is still available to give further testimony in the trial; and

(b) The previous inconsistent statement purports to relate to a matter within the witness's own knowledge.

Although Yellowhorn's statement to the informer is highly incriminating as to the defendant, nonetheless if the defendant offers the statement as substantive evidence of the facts to which Yellowhorn's testimony and her prior statement relate, the trial court could again accommodate the defendant's interest in making substantive use of Yellowhorn's prior statement to the informer by following the same procedures outlined above with respect to the impeachment use of the prior statement and then by additionally instructing the jury that the statement may be also considered by the jury as evidence of any fact to which Yellowhorn's testimony and her prior statement relate.

Since these procedures would adequately protect the defendant's right to a fair trial, I would make the rule absolute as to the order of dismissal.